**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| BRIAN HUGHS,<br><br>         Plaintiff,<br><br>  -against-<br><br>ROYAL ENERGY RESOURCES, INC. and<br>WILLIAM TUORTO,<br><br>       Defendants. | C/A No. 2:20-cv-1566-RMG<br><br><br>**COMPLAINT AND DEMAND<br>FOR JURY TRIAL** |

Plaintiff Brian Hughs ("Hughs") a former employee and director of Royal Energy Resources, Inc. who was terminated unlawfully for engaging in protected whistleblowing activity, alleges as follows:

**INTRODUCTION**

1.      Until May 9, 2019, Plaintiff Brian Hughs was the Chief Commercial Officer at Royal Energy Resources ("Royal"), a publicly held North American energy recovery company. Royal focuses on the acquisition of coal, gas and renewable energy assets.

2.       Hughs was also on the board of directors of both Royal and another coal producing limited partnership formed in Delaware called Rhino Resource Partners LP ("Rhino").

3.      In December 2018, Hughs discovered that William Tuorto, the CEO and only other director of Royal (as well as one of several directors of Rhino), had been deceiving the boards of both Royal and Rhino.

4.      Moreover, at that time, Tuorto was actually in the middle of trying to complete a self-dealing transaction that would have netted Tuorto millions of dollars at the expense of Royal and Rhino.

5.      Hughs immediately reported Tuorto's misconduct to the independent board members of Rhino and, then, shortly thereafter, to the Securities and Exchange Commission ("SEC").

6.      Hughs' complaints were not just credible, they caused Rhino and Royal to amend their 2018 10-Ks after Hughs pointed out that the previously filed 10-Ks contained material misstatements.

7.      Instead of rewarding Hughs for his diligence, Royal fired him.

8.      Hughs reported the violations to the SEC on April 30, 2019 and was fired on May 9, 2019.

9.      In a blatant attempt to retaliate against Hughs, Tuorto and Royal claimed that Hughs was being fired for cause so that Royal would not have to pay Hughs the severance that he was promised in his Royal employment contract.

10.     The terms of Hughs' employment were governed by an October 13, 2015 employment agreement between Hughs and Royal (the "Agreement") and an amendment to that agreement dated January 31, 2018 (the "Amendment").

11.     Under the Agreement and Amendment, if Hughs is terminated without cause, he is entitled to severance.

12.     Hughs filed a whistleblower action under the Sarbanes-Oxley Act with the Occupational Safety and Health Administration ("OSHA") on July 25, 2019.

13. Although OSHA did not rule on the Sarbanes-Oxley complaint, submissions in that proceeding have made it crystal clear that the reasons Royal provided for terminating Hughs' employment were demonstrably false and pretextual.

14. Thus, Hughs brings this action for breach of contract, breach of contract accompanied by a fraudulent act, and whistleblower retaliation in violation of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank"), 15 U.S.C. § 78u-6 et seq. and in violation of the Sarbanes-Oxley Act ("SOX"), 18 U.S.C. § 1514A(a).

## THE PARTIES

*Plaintiff*

15. Brian Hughs was the Chief Commercial Officer at Royal. His employment with Royal was governed under the Agreement and Amendment. Hughs also sat on the board of directors for Royal and Rhino. Hughs resides in South Carolina.

*Defendants*

16. Royal Energy Resources, Inc. ("Royal") is a publicly held North American energy recovery company, incorporated in Delaware. Royal's business model focuses on the acquisition of coal, gas and renewable energy assets at distressed prices. Royal stock trades under the name "ROYE." Royal's principal place of business is in Charleston, South Carolina.

17. Royal is the owner of Rhino GP, LLC, the general partner of a publicly traded entity called Rhino Resource Partners LP ("Rhino"). Rhino is a coal-producing limited partnership formed in Delaware that is focused on coal and energy related assets and activities. Rhino trades under the name "RHNO."

18. Both Royal's and Rhino's securities are registered under Section 12(g) of the Securities and Exchange Act of 1934.

19.     William Tuorto was the CEO of Royal until January 31, 2018.  Since that date, Tuorto has been the Executive Chairman of Royal and Rhino, and is a director on the boards of Royal and Rhino.  On information and belief, William Tuorto is a resident of South Carolina.

## JURISDICTION, VENUE & TIMELINESS

20.     The Court has subject matter jurisdiction over this suit pursuant to 28 U.S.C. §1332(a)(1), as it involves claims arising under federal statutes, specifically Dodd-Frank, 15 U.S.C. § 78u-6 et seq. and SOX, 18 U.S.C. § 1514A(a).

21.     This Court has supplemental jurisdiction over the claims arising from state law pursuant to 28 U.S.C. §1367.

22.     Venue is proper in this district pursuant to 28 U.S.C. §1391(1) because Defendants Royal and Tuorto both reside in South Carolina and pursuant to 28 U.S.C. §1391(2) because a substantial part of the events or omission giving rise to the claim took place in South Carolina.

23.     This Court has jurisdiction over Hughs' claims arising under SOX because Hughs timely filed a complaint with OSHA and more than 180 days have lapsed without the Department of Labor rendering a final decision.  Hughs filed a complaint against Royal and Tuorto alleging violation of the anti-retaliation provisions in 18 U.S.C.A. § 1514A(a) with OSHA on July 25, 2019.  A letter from the United States Department of Labor confirming receipt of that complaint is attached as Exhibit A.  More than 180 days have lapsed since that filing and the Secretary of Labor has not issued a final decision.

## FACTUAL ALLEGATIONS

### I.    HUGHS IS EMPLOYED BY ROYAL

24.    On October 13, 2015, Hughs executed an employment agreement ("Agreement") with Royal.  Under the terms of that Agreement, Hughs would be employed as a Director and Vice President for Royal.  A copy of the Agreement is attached as Exhibit B.

25.    The Agreement was for a three-year initial term.  During that initial term and during any successive terms, Hughs' employment could be terminated only (a) by Royal, "for cause," (b) by Royal, "without cause," (c) by Hughs, for "good reason," or (d) by Hughs, following a "change in control."  The Agreement contains a definition of "for cause" in Section 6.2.1.

26.    Pursuant to section 6.2.5 of the Agreement, following termination, Hughs would be entitled to severance pay equal to three years of his base compensation, as well as additional benefits unless he were terminated by Royal for cause.

27.    On January 31, 2018, Hughs and Royal executed an amendment to the employment agreement ("Amendment").  Under the Amendment, Hughs' title was changed to Chief Commercial Officer for the company.  The term of his employment was extended to five years from the date of the Agreement, and Hughs' annual base compensation was raised to $375,000.  The provisions in the Agreement concerning termination "for cause" remained intact. Under the Amendment, Hughs remained entitled to severance pay equal to three years of his base compensation – now $375,000 – in the event he were terminated without cause.  A copy of the Amendment is attached as Exhibit C.

28.    Hughs also served on the board of directors for both Rhino and Royal.

## II.    RHINO SELLS THE SANDS HILL MINE IN RETURN FOR LIMESTONE ROYALTIES AND RECORDS A GAIN FROM THE TRANSACTION

29.    Until 2017, Rhino operated a mining complex in Ohio called Sands Hill.  Rhino mined coal and limestone at Sands Hill.  Due to weakened market conditions, Rhino planned to cease mining coal at the Sands Hill complex in 2017.  However, as explained in Rhino's 2016 10-K, Rhino intended to continue its limestone business at the mine for the following 12-18 months.  For the year ended December 31, 2016, the Sands Hill mine produced approximately 100,000 tons of steam coal and approximately 400,000 tons of limestone aggregate.

30.    Rhino's press release for its 1st Quarter 2017 financials noted that "The Sands Hill operations continued limestone sales exceed[ed] the forecast and this helped bolster the financial results for this operation."

31.    On November 7, 2017, Rhino sold the Sands Hill mine to a third party (hereinafter "Purchaser").  Under the terms of that deal, Rhino transferred 100% of the membership interests and related assets and liabilities of Sands Hill Mining LLC to the Purchaser.  And Rhino received a perpetual fifty-cent per ton royalty on any minerals mined at Sands Hill with the exception of coal.

32.    Rhino's fourth quarter press release for 2017 describes this deal, stating that: "On November 7, 2017, the Partnership closed an agreement with a third party to transfer 100% of the membership interests and related assets and liabilities of Sands Hill Mining LLC to the third party in exchange for a future override royalty for any mineral sold, excluding coal, from Sands Hill Mining LLC after the closing date.  The Partnership recognized a gain of $3.2 million from the sale of Sands Hill Mining LLC since the third party assumed the reclamation obligations associated with this operation."

33.    Coal mine reclamation is the rehabilitation of land after coal mining operations have stopped.  Mining companies like Rhino obtain surety bonds to cover reclamation liabilities. By having a third-party take over those liabilities for Sands Hill, Rhino would reduce its own liabilities.

34.    Rhino's 2017 fiscal year 10-K includes the following descriptions of the benefits Rhino was receiving from the transaction:

- "On November 7, 2017, we closed an agreement with a third party to transfer 100% of the membership interests and related assets and liabilities in our Sands Hill Mining entity to the third party in exchange for a future override royalty for any mineral sold, excluding coal, from Sands Hill Mining LLC after the closing date."

- "We recognized a gain of $3.2 million from the sale of Sands Hill Mining LLC since the third party assumed the reclamation obligations associated with this operation."

- "The Partnership recognized a gain of $3.2 million from the sale of Sands Hill Mining LLC since the third party assumed the reclamation obligations associated with this operation."

35.    The sale of the Sands Hill Mine was also disclosed in Royal's fiscal year 2017 10-K, which states that the "Company recognized a gain of $1.8 million from the sale of Sands Hill Mining LLC since the third party assumed the reclamation obligations associated with this operation."

### III.   TUORTO RECOMMENDS THAT RHINO ACCEPT A DEAL RELATED TO SANDS HILL THAT WAS NOT IN RHINO'S INTEREST

36.    In the first quarter of 2018, shortly after the sale of the Sands Hill mine, Tuorto advised Rhino management to accept a deal related to Sands Hill that was not actually in Rhino's interest.

37.    Rhino management accepted the recommendation based on Tuorto's representations.

### IV.   ROYAL ENTERS AN AGREEMENT FOR A ROYALTY ON COAL MINED ON THE SANDS HILL MINE

38.    Royal (the owner of Rhino's general partner) also entered into a November 10, 2017 overriding royalty agreement with regard the Sands Hill mine, but for coal instead of the limestone.  Under that agreement, (i) Red Hill, a company owned by Daniel Tayloe (a friend and business partner of Tuorto), would be the exclusive buyer of coal produced by the Sands Hill mine and (ii) Red Hill would pay Royal a $4.00 royalty per ton for all coal of any size or quality, sold, loaded or otherwise transported through the Riverway Dock on the Big Sandy River.  In return, Royal was to provide $400,000 of Royal's common stock as consideration to Tayloe personally.

### V.   HUGHS DISCOVERS THAT THE PURCHASERS HAD NOT ASSUMED THE SURETY BONDS FOR SANDS HILL

39.    In later October or early November of 2018, Hughs learned from Rhino's CEO, Richard Boone, that the Purchasers had not, in fact, assumed the surety bonds for Sands Hill, and those bonds remained in Rhino's name.

40.    Hughs became deeply concerned.  Rhino had sold Sands Hill almost a year earlier, and yet the full amount of the reclamation liability remained in Rhino's name.  Hughs was particularly concerned that the representations in Rhino's public filings were not correct.  He

recalled that Rhino and Royal had represented in their SEC filings that the Purchasers had assumed the reclamation liability, and as a result, the companies' liabilities had decreased by millions of dollars.   Based on what Hughs learned from Boone, the reclamation liability actually remained in Rhino's name.

41.     Throughout the fall of 2018, the surety bonds remained in Rhino's name.

42.     Even though Rhino was still on the hook for the reclamation liability, neither Rhino nor Royal had issued any public statements correcting their 2017 10-Ks.  Nor, to the best of Hughs' knowledge, had this problem been brought to the attention of their auditors.

43.     On or about December 18, 2018, Hughs spoke with Shannon Burnett, one of the purchasers of the Sands Hill mine.  Hughs called Burnett to discuss several issues, including the Purchasers' failure to assume the surety bonds.

44.     During that call, Burnett informed Hughs of a number of alarming facts.

45.     Among them, Burnett told Hughs that Tuorto had told Burnett not to worry about assuming the reclamation liabilities.

46.     Hughs became quite concerned that Tuorto was not trying to resolve the bonding issue.  Hughs' concerns about Rhino's public filings became more acute.

47.     At least two other members of Rhino's management – Tuorto and Boone – had apparently known about the failure of Sands Hill to assume the surety bond for months. However, as of December 2018, Rhino had not removed itself from the surety bonds and had not issued any corrective SEC filings.

48.     By December 2018, Hughs believed that Rhino and Royal's statements in their 2017 10-K's were misleading and that not disclosing Rhino's continued obligation for the surety bonds in a corrective statement was a material omission.

### VI.    DURING THE SAME CALL, HUGHS LEARNS THAT TUORTO SECRETLY MADE A SIDE DEAL TO PERSONALLY PROFIT FROM SAND HILL'S LIMESTONE SALES

49.    During that same phone call, Burnett informed Hughs that months earlier, he, Tuorto, and Tayloe negotiated a long-term deal with a company called Melvin Stone ("Melvin") for the sale of limestone from the Sands Hill mine to Melvin.

50.    Under the terms of the deal, which was signed on or around April 26, 2018, Melvin committed to purchase from the Purchasers 300,000 tons of limestone per year for five years.  The agreement also included a possible extension of up to three additional five-year periods.  Because Rhino had a 50-cent royalty on any non-coal sold at the Sands Hill mine, Rhino should have been entitled to royalties on the sale of limestone to Melvin.  With the sale of 300,000 tons a year, Rhino should have received $150,000 a year for five years, with a possible extension of fifteen additional years.  In other words, the deal was worth between $750,000 and $3 million in royalties to Rhino.

51.    This was the first time Hughs had heard about this deal.

52.    Burnett then explained that Tuorto had not only negotiated the deal; Tuorto also personally received approximately $2 million from it.

53.    Hughs was shocked.

54.    Burnett explained to Hughs that the deal included an initial payment from Melvin of approximately $4.5 million.  Deal documents provided by Burnett showed that most of this money was a prepayment for limestone mined at Sands Hill.

55.    According to Burnett, the parties had initially agreed that the $4.5 million was to be divided equally among Burnett, Tuorto, and Tayloe.  But eventually Tuorto convinced Burnett to give Tuorto and Tayloe approximately $3.7 million of the payment to split between the two of them, leaving Burnett with approximately $775,000 in proceeds.

10

56.     Burnett provided Hughs with copies of the deal documents and a disbursement authorization showing a payment of $3,699,675.00 to Tuorto's friend, Tayloe.

57.     Burnett explained to Hughs that under an oral side agreement, Tayloe and Tuorto had agreed that Tayloe would be the official recipient of most of the initial $3.7 million payment from Melvin, but would pass half of what he received on to Tuorto.  Based on this information and documents subsequently provided by Burnett, Hughs came to believe that this arrangement was designed to conceal Tuorto's financial interest in the deal.

58.     Hughs found it remarkable and highly suspicious that Burnett, as an owner of Sands Hill, received only $775,000 in proceeds, while Tayloe, who was not an owner and had an exclusive right only to purchase coal from Sands Hill, received nearly $3.7 million for a deal concerning the sale of limestone from the mine.

59.     Burnett sent Hughs a copy of a text Tuorto had sent to Burnett, in which Tuorto requested that Burnett not disclose the side arrangement to others.  In it, Tuorto wrote:

"Sands Hill – Melvin – Waterloo deals are privileged to you me and Dan only.  Just making sure to remind you."

60.     Hughs realized that Tuorto was simultaneously (i) negotiating an undisclosed side deal by which he would personally be enriched by several million dollars from the sale of limestone mined at Sands Hill and (ii) recommending that Rhino accept a deal with Sands Hill that would disadvantage Rhino.

61.     Hughs reasonably believed and believes that Tuorto personally profited from the transaction.  Burnett told Hughs that this was the plan.  Burnett shared with Hughs the text quoted above, which demonstrates that Tuorto was attempting to conceal the deal from Rhino.  Furthermore, the economics of the deal, whereby Tayloe – who does not have any right to the

11

limestone mining at Sands Hill – received the lion's share of the payout while the actual mine owner received a small fraction of that amount are highly suspicious.

62.     Tuorto has not disputed that he knew about the Melvin deal.  Yet he failed to disclose it to Rhino.  Instead, Tuorto concealed the Melvin deal while simultaneously recommended that Rhino waive its future royalties from Sands Hill for a one-time payment that was far less than what Rhino should have received.

63.     Upon learning of the Melvin deal and Tuorto's involvement, Hughs reasonably believed that Tuorto had engaged in a scheme to defraud Rhino.  That scheme appeared to involve multiple forms of communication, including text-messaging.

64.     Hughs also reasonably believed that Rhino and Royal's SEC filings contained material omissions because they failed to disclose to shareholders (a) Tuorto's self-dealing and (b) management's decision to accept a one-time payout in exchange for waiving more valuable royalties.

65.     Furthermore, Tuorto's conduct violated Rhino's internal controls.  Section IV.7 of the Rhino Code of Ethics states that "No Team Member or their respective immediate family members shall maintain or enter into any direct or indirect involvement, arrangement, understanding, or obligation which might result in a conflict between the personal interest of the Team Member and the best interests of the Rhino Entities, or might imply such a conflict.  Any questions regarding a potential conflict of interest must be addressed to the General Counsel."  Tuorto's negotiation of the Melvin deal, while simultaneously recommending that Rhino forgo future royalties, violates this provision.

### VII.    HUGHS ALSO DISCOVERS THAT RED HILL HAS BEEN UNDERPAYING ROYALTIES TO ROYAL FOR COAL SALES

66.    During Hughs' December 2018 discussion with Burnett, Hughs also inquired into the royalties due to Royal on sales of coal shipped through the Riverway Dock.  Burnett agreed to provide records of his coal sales passing through Riverway Dock.

67.    Hughs compared those record against corresponding records previously supplied by Tayloe's company, Red Hill.

68.    Burnett's records suggested that starting in June 2018, thousands more tons of coal passed through the Riverway Dock than had been reported by Red Hill.

69.    Red Hill was obligated to pay Royal a $4/ton royalty on coal that passed through the Riverway Dock.  Therefore, by reducing the number of tons it reported, Red Hill could underpay the royalties due to Royal.

70.    This underreporting appears to have begun shortly after the side deal was signed. Given what Hughs had learned about Tuorto's dealings with Tayloe on the limestone deal, Hughs became concerned that Tuorto was working with Tayloe to underreport coal sales passing through the dock, effectively defrauding Royal.

### VIII.   HUGHS INFORMS RHINO'S AUDIT COMMITTEE OF HIS FINDINGS AND REQUESTS AN INVESTIGATION

71.    After speaking with Burnett on or about December 18, 2018, Hughs orally disclosed his findings to Rhino's independent directors.

72.    Hughs then drafted and sent a written complaint to Hanig and Thompson.  In it, Hughs summarized the terms of the sale of the Sands Hill mine, including the fact that the surety bonds were supposed to be transferred within 30 days of the deal, explained that the surety bonds were actually still in Rhino's name, explained the limestone royalty, described Tuorto's request that Rhino waive future royalties, and described in detail Tuorto's side deal with Melvin.

## IX.    AN INTERNAL INVESTIGATION BEGINS

73.    Based on Hughs' complaint, the Rhino Audit Committee initiated an internal investigation and hired an outside law firm to represent the Audit Committee in the investigation.

74.    On January 2, 2019, Hughs was interviewed by the outside firm for approximately an hour.  Hughs subsequently provided additional information to the firm through his counsel on multiple occasions.

75.    When the preliminary results of the investigation were presented to the Rhino board on March 19, 2019, Hughs objected to what he believed to be Tuorto's influence in improperly narrowing the scope of the investigation.

76.    On April 10, 2019, Hughs sent a letter to the Audit Committee demanding that the internal investigation be continued into allegations of self-dealing by Tuorto in connection with Sands Hill and the failure to transfer the bonding liability on Sands Hill, among other things.

## X.    AS A RESULT OF HUGHS' COMPLAINT, ROYAL AND RHINO'S SEC FILINGS ARE AMENDED TO DISCLOSE THE RECLAMATION LIABILITY

77.    As a direct result of Hughs' request, Rhino launched the internal investigation.

78.    As a result of Hughs complaint about potential securities fraud in December 2018, the disclosures in Rhino's 10-K for 2018 were changed to reflect that the Rhino still had reclamation obligations for both Sands Hill and a separate operation, Deane Mining.

79.    Here is a comparison of the second paragraphs of the section of the 10-K titled "Surety Bonds" from Rhino's 2017 10-K and Rhino's 2018 10-K:

- 2017 10-K: As of December 31, 2017, the Partnership had approximately $37.5 million in surety bonds outstanding to secure the performance of its reclamation obligations.

- 2018 10-K:  As of December 31, 2018, we had approximately $42.6 million in surety bonds outstanding to secure the performance of our reclamation obligations. Of the $42.6 million, approximately $0.4 million relates to surety

bonds for Deane Mining, LLC and approximately $3.4 million relates to surety bonds for Sands Hill Mining, LLC, which in each case have not been transferred or replaced by the buyers of Deane Mining, LLC or Sands Hill Mining, LLC as was agreed to by the parties as part of the transactions. We can provide no assurances that a surety company will underwrite the surety bonds of the purchasers of these entities, nor are we aware of the actual amount of reclamation at any given time. Further, if there was a claim under these surety bonds prior to the transfer or replacement of such bonds by the buyers of Deane Mining, LLC or Sands Hill Mining, LLC, then we may be responsible to the surety company for any amounts it pays in respect of such claim. While the buyers are required to indemnify us for damages, including reclamation liabilities, pursuant the agreements governing the sales of these entities, we may not be successful in obtaining any indemnity or any amounts received may be inadequate.

80.    Royal's 2018 10-K was similarly amended.

## XI.    HUGHS FILES A WHISTLEBLOWER COMPLAINT WITH THE SEC

81.    On April 30, 2019, Hughs made a whistleblower complaint to the SEC via the SEC's online portal.

82.    In that submission, Hughs described the terms of Rhino's sale of the Sands Hills mine, the failure to transfer the bonding liability for Sands Hill, and Tuorto's side deal with Melvin, among other things.

83.    In the SEC submission, Hughs wrote that it appears Tuorto may have personally benefitted from the Sands Hill transaction without disclosing these personal dealings and may have deprived Rhino investors of opportunities that belong to Rhino.

84.    He also indicated that he believed this conduct had resulted in material misstatements or omissions in the company's public filings, financial statements, and/or a failure to file.

85.    The same day, April 30, 2019, Hughs resigned as a director of Rhino.  He did so because he objected to the narrow scope of the internal investigation and was concerned that a deeper investigation or lawsuit could result in finding that the Rhino board had not adequately investigated Tuorto's misconduct.

86.     In his resignation letter, Hughs explained that he had "serious concerns about the adequacy of the investigation" conducted by outside counsel, that those "concerns have not been addressed adequately" and he had determined he could "no longer serve in good faith as a Rhino Director."

87.     Rhino's 8-K statement disclosing Hughs' resignation includes the text of Hughs' letter and also explains:

> Brian Hughs, director of Rhino GP LLC, the general partner of Rhino Resource Partners LP (the "Partnership"), resigned from the board of directors (the "Board") of Rhino GP LLC as of April 30, 2019. Mr. Hughs' resignation relates to a disagreement on an internal investigative matter being performed by the Board's conflicts committee where he felt his concerns related to the matter have not been adequately addressed. The investigation relates to an allegation by a director that another director (not Mr. Hughs) engaged in self-dealing in connection with the sale by the Partnership of Sands Hill Mining, LLC in November 2017. In response to this allegation, the conflicts committee of the Board has retained counsel to conduct an investigation, which is ongoing.

## XII.    HUGHS IS TERMINATED IN RETALIATION

88.     On May 9, 2019, Defendants unlawfully terminated Hughs' employment.  Hughs was also improperly removed from Royal's board.  Prior to his improper removal, Hughs and Tuorto were the only directors on Royal's board.

89.     Tuorto claimed that he had secretly acquired preferred stock in Royal, which gave him a majority vote on all matters requiring a shareholder vote.  Tuorto claimed that he had the unilateral authority to terminate Hughs.

90.     This adverse action took place within days of Hughs' written objection to the inadequate scope of the internal investigation.

91.     In a letter to Hughs dated May 9, 2019, Royal alleged that it had terminated Hughs "for cause" and has refused to pay Hughs any severance.

### XIII.    THE REASONS GIVEN FOR HUGHS' TERMINATION ARE PLAINLY PRETEXTUAL

92.    The Agreement defines "for cause" in section 6.2.1 as encompassing six types of

conduct.  Two of these – conviction of a felony and death or disability – are not relevant here.

93.    The remaining bases for a "for cause" termination are that the employee:

(a) Fails or refuses in any material respect to perform any duties, consistent with his position or those which may reasonably be assigned to him by the Board or materially violates company policy or procedure;

(b) Is grossly negligent in the performance of his duties hereunder;

(c) Commits of any act of fraud, willful misappropriation of funds, embezzlement or dishonesty with respect to the Company;

---

(e) Engages in any other intentional misconduct adversely affecting the business or affairs of the Company in a material manner.  The term "intentional misconduct adversely affecting the business or affairs of the Company" shall mean such misconduct that is detrimental to the business or the reputation of the Company as it is perceived both by the general public and the biotechnology industry;

94.    With respect to (a) and (b), the Agreement provided that Hughs could not be

terminated unless Royal gave written notice of and opportunity to cure the alleged cause for

termination and Hughs failed to do so within thirty days.

95.    In their letter, Royal identified ten purported bases for terminated Hughs "for

cause":

1.  Engaging in other business, or accepting other employment, without the prior written consent of Royal, in violation of Sections 2 and 5.12 of the Agreement, as expressly admitted by you in letter dated December 7, 2018 to the Conflicts Committee of the Board of Directors of Rhino Resource Partners LP;

2.  Failure to use the Company's expense reimbursement form as expressly instructed, and/or to provide proper substantiation and reporting of reimbursable expenses in accordance with the Company's rules, regulations, policies and practices, and failure to cure same after notice, in violation of Section 4 of the Agreement;

3.  Disclosing Confidential Information to unauthorized third parties, as such term is defined in the Agreement, in violation of Section 5.1 of the Agreement;

4. Making libelous, slanderous and disparaging statements about the Company, and/or its management and executives, in violation of Section 5.5 of the Agreement;

5. Failure to comply with Company policies in regard to travel, expense reimbursement, and payroll, in violation of Section 5.11 of the Agreement;

6. Contacting business counterparties of Rhino Resource Partners LP and its subsidiaries (collectively, "Rhino"), in violation of Rhino's code of conduct for directors, and failure to cease such conduct after notice thereof dated February 7, 2019;

7. Fraud, violations of The Sarbones [sic]-Oxley Act of 2002, willful misappropriation of funds;

8. Embezzlement and dishonesty in regard to the withdrawal of $100,000 from the Company's bank account outside of established payroll practices even after being advised that such withdrawals were not permissible, resulting in a cost to the Company of more than $50,000 in applicable withholdings above the authorized amount of any bonus due to you;

9. Use of a debit card on Company's bank account to pay for personal expenses and/or expenses relating to unauthorized business or employment activity, including, without limitation, travel to destinations not connected in any way with the Company's business; and

10. Intentional misconduct that adversely affects the business or affairs of the Company, including communications with various third parties, directly or through your agents, intended to cause harm to the Company and its reputation.

96. These purported reasons for Hughs' "for cause" termination are baseless. Defendants intentionally fabricated reasons for terminating Hughs to conceal the fact that they terminated him in retaliation for his whistleblowing conduct.

97. Most of these "reasons," including 2,3,4,5,6,7,9 and 10 above, are described so vaguely, it is not possible to determine what Hughs was being accused of doing. Several purported acts appear to be copied and pasted from stock language.

98. Many of the acts alleged in Royal's letter do not constitute conduct covered by Section 6.2.1's subparts (c) – acts of fraud, misappropriation, embezzlement, or (e) – intentional misconduct that affects the Company in a material manner. Accordingly, under the Agreement,

Hughs was entitled to notice and an opportunity to cure. Royal never provided any such notice before terminating Hughs.

99.    Furthermore, this list of purported bases for termination include immaterial allegations; for example, Hughs is accused of failing to use the company's "expense reimbursement form as expressly instructed."

### XIV. UNDISPUTED EVIDENCE OF PRETEXT WAS UNCOVERED IN THE SARBANES-OXLEY ACTION

100.    The remarkable extent to which these purported bases for termination were pretextual become more apparent after Hughs filed a Sarbanes-Oxley whistleblower complaint with OSHA.

101.    On July 25, 2019, Hughs filed a complaint with OSHA under the provisions of the Sarbanes-Oxley Act preventing retaliation against whistleblowers (the "SOX Complaint").

102.    Defendants filed responsive documents. In their Opposition Statement, Defendants described in detail four reasons they terminated Hughs. All are demonstrably false.

103.    First, Defendants claim that they terminated Hughs because he breached the Code of Ethics by soliciting Peter Bradley, the CEO of Javelin Global Commodities ("Javelin,") to put up a $2.75 million advance loan fee in connection with a third party, Noble Bottling.

104.    This solicitation simply never happened. Hughs never communicated with Peter Bradley or anyone else at Javelin about Noble Bottling.

105.    In their Opposition Statement to OSHA, Defendants quote a letter that was supposedly sent by Hughs to Peter Bradley in January 2019.

106.    They did not attach the letter because no such letter was ever sent to Peter Bradley.

107.    The lender on the Noble Bottling financing deal is named Peter Cheng.  Peter Cheng is not Peter Bradley and Peter Cheng has nothing whatsoever to do Javelin.  On January 15, 2019, Hughs sent an email to Jeremy Lantz, the CEO of Noble Bottling.  The email included an attachment addressed to "Peter" that appears to be the document Defendants quoted.

108.    On January 15 and 16, 2019, Hughs communicated over email with Lantz and Peter Cheng.  Those emails make it perfectly clear that the "Peter" in the letter sent on January 15, 2019, is Peter Cheng.

109.    Peter Bradley's name does not appear anywhere in these documents because Hughs at no point approached him or anyone at Javelin about this opportunity.  None of these documents include any suggestion whatsoever that the "Peter" in question is "Peter Bradley."

110.    In an effort to justify their retaliatory firing of Hughs, Defendants attempt to read Peter Bradly's name into correspondence that never names him, was never sent to him, and had nothing to do with him.

111.    Defendants' allegations are so bizarre that an analogy may be helpful.  Imagine a situation in which an employee drafts a personal letter to his uncle "Donald" during working hours.  He is fired for violating a term of his employment that he not engage in political activities while at work.  His boss explains that he fired this employee on the theory that the Donald in question must be the President.  Defendants' purported reason for terminating Hughs is no less absurd.

112.    This "reason" for firing Hughs is demonstrably false.

113.    It is implausible that Defendants would have based their decision to fire Hughs for cause on a letter addressed to a "Peter" without any investigation whatsoever into Peter's last name.  A simple phone call to Hughs would have resolved this point.

114.    The second reason Defendants provided to OSHA for terminating Hughs was that "substantially all" of Hughs' $38,598.59 debit charges for the month of March 2019 "are fraudulent."

115.    Defendants did not provide OSHA with any detail into these charges or why they appear fraudulent, even though they have access to the charges.

116.    This justification for terminating Hughs was also made out of whole cloth.

117.    While Hughs no longer has access to his work accounts, a quick review of the receipts he has available substantiates at least $31,710.97 of work-related charges in March 2019.  All of these charges are for either coal conference fees or travel expenses to/from conferences or work meetings.

118.    Hughs provided these receipts to OSHA in response to Defendants' assertions. Defendants did not provide any evidence in response.

119.    Third, Defendants informed OSHA that they terminated Hughs because Hughs paid himself an unauthorized bonus of $100,000 in December 2018.  Defendants claimed that Hughs was supposed to wait for paperwork to sign before withdrawing that amount and was not authorized to withdraw the full $100,000.

120.    Hughs is in possession of a voicemail from Tuorto authorizing Hughs to withdraw that money.  In it, Tuorto states the following: "Hey Hughs, I'll leave you the voicemail so you have it on the record.  I met with Scott let him know, that the other director, approving today's wire by you for purposes of the bonus.....just wanted to make sure you knew you were good to go, buddy."

121.    Tuorto does not tell Hughs that he needs to wait for the paperwork to come through before withdrawing the funds.  To the contrary, Tuorto states "he'll send you the

paperwork whenever you send the wire." Tuorto indicates that Hughs could go ahead and make the wire transfer for his bonus that same day.

122.    Hughs in no way violated Tuorto's instructions. It is unreasonable and obviously pretextual for Defendants to terminate Hughs for cause when Hughs simply did what he had been authorized to do.

123.    Finally, Defendants allege that Hughs was terminated because he falsely claimed to Rhino and Royal's D&O insurer that the FBI was investigating Royal.

124.    Defendants admit that FBI agents met with Royal shareholders, but allege that the purpose of these meetings was to investigate a missing child in West Texas.

125.    This is just false.

126.    Multiple Royal shareholders in West Texas have confirmed that FBI agents met with them specifically to ask questions about their decision to purchase Royal stock. These interviews had nothing to do with a missing child.

127.    Hughs informed Royal and Tuorto about these interviews, and a simple call to Royal's largest shareholders would have confirmed that the FBI agents were investigating Royal.

128.    In sum, Defendants knowingly fabricated reasons for Hughs firing. They not only lied to Hughs about why he was being fired, but also lied to the federal investigator handling Hughs' SOX claim.

## XV.    HUGHS HAS SUFFERED SUBSTANTIAL INJURIES AS A RESULT OF DEFENDANTS' UNLAWFUL TERMINATION

129.    As a result of Defendants' unlawful termination of Hughs, Hughs has been deprived his income and benefits. He has also been deprived the severance he is due under his employment agreements.

130.    He has been forced to file a SOX whistleblower action and this action in order to protect his contractual rights and his rights as a whistleblower.

131.    Hughs has also been harmed by Defendants' false statements regarding his conduct and their reasons for terminating him.  Royal filed an 8-K with the SEC stating that Hughs was terminated "for cause," and informed Rhino's business partners by letter that Hughs is no longer associated with Rhino or Royal and that his is bound by a non-solicitation clause.  Those statements harmed Hughs' reputation and deterred third parties from associating or dealing with him.

## CAUSES OF ACTION

### COUNT ONE
### WHISTLEBLOWER RETALIATION IN VIOLATION OF THE DODD-FRANK WALL STREET REFORM AND CONSUMER PROTECTION ACT,
### 15 U.S.C. § 78u-6 *et seq.*
### (against all Defendants)

132.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every preceding paragraph as if fully set forth herein.

133.    Royal and Rhino securities are registered under Section 12 of the Securities Exchange Act of 1934.

134.    Hughs provided information to (i) the two independent directors of Rhino, who comprised the Audit Committee and (ii) investigators hired to conduct an internal investigation concerning conduct that Hughs reasonably believed constituted a violation of federal securities laws prohibiting material misstatements or omissions in the company's public filings and financial statements as well as laws prohibiting wire and mail fraud.  These laws include, but are not limited to Section 10(b) of the 1934 Act, Rules 10(b)(5) and 17(a)(2), 18 U.S.C. 1341, and 18 U.S.C. 1343.

135.    On April 30, 2019, Hughs filed a complaint with the SEC through the online

portal describing this conduct and indicated that he believe it had resulted in material

misstatements or omissions in the company's public filings, financial statements, and/or a failure

to file.

136.    Hughs' disclosures were protected under the Sarbanes-Oxley Act, 18 U.S.C. §

1514A(a).

137.    On May 9, 2019, Defendants unlawfully terminated Hughs in retaliation for his

whistleblowing, in violation of 15 U.S.C.A. § 78u-6 et seq.

138.    As a result, Hughs was harmed by the loss of income, reputational damage,

personal humiliation and anguish, and by incurring attorneys' fees.   Among other things, he is

entitled to two times the amount of back pay owed plus interest.

**COUNT TWO**
**WHISTLEBLOWER RETALIATION UNDER THE SARBANES-OXLEY ACT**
**18 U.S.C.A. § 1514A**
**(against all Defendants)**

139.    Plaintiff re-alleges and incorporates by reference each and every allegation in

each and every preceding paragraph as if fully set forth herein.

140.    Royal and Rhino securities are registered under Section 12 of the Securities

Exchange Act of 1934.

141.    Hughs provided information to (i) the two independent directors of Rhino, who

comprised the Audit Committee and (ii) investigators hired to conduct an internal investigation

concerning conduct that Hughs reasonably believed constituted a violation of federal securities

laws prohibiting material misstatements or omissions in the company's public filings and

financial statements as well as laws prohibiting wire and mail fraud.  These laws include, but are

not limited to Section 10(b) of the 1934 Act, Rules 10(b)(5) and 17(a)(2), 18 U.S.C. 1341, and 18 U.S.C. 1343.

142.    On April 30, 2019, Hughs filed a complaint with the SEC through the online portal describing this conduct and indicated that he believe it had resulted in material misstatements or omissions in the company's public filings, financial statements, and/or a failure to file.

143.    Hughs' disclosures were protected under the Sarbanes-Oxley Act, 18 U.S.C. § 1514A(a).

144.    On May 9, 2019, Defendants unlawfully terminated Hughs in retaliation for his whistleblowing, in violation of 18 U.S.C.A. § 1514A.

145.    On July 25, 2019, Hughs filed a whistleblower complaint with OSHA against Royal and Tuorto alleging violation of the anti-retaliation provisions in 18 U.S.C.A. § 1514A(a). More than 180 days have lapsed since that filing and the Secretary of Labor has not issued a final decision

146.    As a result of Defendants' misconduct, Hughs was harmed by the loss of income and benefits, reputational damage, personal humiliation and anguish, and by incurring attorneys' fees.

## COUNT THREE
## BREACH OF CONTRACT
### (against Royal)

147.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every preceding paragraph as if fully set forth herein.

148.    Hughs and Royal entered into valid, binding employment contracts.

149.    Royal breached those contracts when it terminated Hughs without paying him compensation due under the Agreement and Amendment for termination without cause.

150. Royal did not have a reasonable good faith belief that sufficient cause existed for termination.

151. As a result, Hughs has suffered damages, including but not limited to the compensation and benefits he was owed under the agreements.

## COUNT FOUR
## BREACH OF CONTRACT ACCOMPANIED BY A FRAUDULENT ACT
### (against Royal)

152. Plaintiff re-alleges and incorporates by reference each and every allegation in each and every preceding paragraph as if fully set forth herein.

153. Defendants breached their employment contracts with Hughs when they terminated him.

154. Defendants intentionally fabricated pretextual reasons for terminating Hughs.

155. Defendants knew that the bases they asserted for terminating Hughs were false.

156. Defendants nonetheless told Hughs he had been fired for those reasons.

157. After terminating Hughs, Defendants represented to a federal investigator that they had had terminated Hughs for pretextual reasons.

158. As a result of Defendants' misconduct, Hughs was harmed by the loss of income and benefits, reputational damage, personal humiliation and anguish, and by incurring attorneys' fees.

159. Accordingly, Hughs is entitled to punitive damages.

## PRAYER FOR RELIEF

WHEREFORE the Plaintiff prays that this Court:

A. Award compensatory damages to Plaintiff in an amount to be determined at trial;

B. Award double back pay with interest;

26

C.      Award special damages for reputational damage, personal humiliation and

anguish and other non-economic harm;

D.      Award statutory and punitive damages;

E.      Award litigation costs and expenses to Plaintiff, including, but not limited to,

reasonable attorneys' fees and expert witness fees;

F.      Award pre-judgment and post-judgment interest for damages suffered by Plaintiff.

G.      Award any additional and further relief as are deemed just and proper.

**DATED:**  CHARLESTON, SC
     April 22, 2020

        s/ Christy Ford Allen
        Christy Ford Allen (Fed. Bar #07549)
        WILLS MASSALON & ALLEN LLC
        Post Office Box 859
        Charleston, South Carolina  29402
        (843) 727-1144
        callen@wmalawfirm.net

        and

        Rishi Bhandari
        *(Pro Hac Vice Motion Forthcoming)*
        A.  Leah Vickers
        *(Pro Hac Vice Motion Forthcoming)*
        MANDEL BHANDARI LLP
        80 Pine Street, 33rd Floor
        New York, NY 10005
        T:  (212) 269-5600
        F:  (646) 964-6667
        rb@mandelbhandari.com
        lv@mandelbhandari.com

        ATTORNEYS FOR PLAINTIFF